Julio L. COLON, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–370C.

United States Court of Federal Claims.

Jan. 12, 1994.

Guy J. Ferrante, Falls Church, VA, for plaintiff.

William C. Peachy and Mary L. Smith, Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger, Director David M. Cohen and Asst. Director James M. Kinsella, for defendant. Captain Michael Smith, Office of the Judge Advocate Gen., Dept. of the Army, Arlington, VA, of counsel.

### *OPINION*

LYDON, Senior Judge:

Plaintiff, a former commissioned warrant officer in the regular Army, seeks reinstatement to his former military position together with attendant back pay, allowances and other relief, on the ground his resignation from the Army for the good of the service was involuntary and thus null and void. Plaintiff was denied administrative relief by both the Army Discharge Review Board (ADRB) and the Army Board for the Correction of Military Records (ABCMR). The parties are in agreement that no material facts are in dispute and have moved for summary judgment on the question of the voluntariness of plaintiff's resignation. Defendant has also moved to dismiss the complaint on jurisdictional grounds. After careful consideration of the administrative record, the submissions of the parties and oral argument, the court con-

cludes that plaintiff's resignation was voluntary.

### FACTS

Plaintiff enlisted in the Regular Army in December 1976 at age 26, and thereafter attained the rank of Specialist Five (SP–5), with a primary Military Occupational Specialty (MOS) of Helicopter Repairman. He received an Honorable Discharge from the Army as a SP–5 on August 27, 1979, in order to accept an appointment on August 28, 1979 as a Reserve Warrant Officer of the Army. This appointment was ostensibly for an indefinite term. Plaintiff was promoted to Chief Warrant Officer Two (CW2) on August 28, 1981.

During the years 1979 to 1985, plaintiff completed the following training courses: Warrant Officer Rotary Wing Aviation Course (44 weeks); AH–16 Aviator Qualification Officer Course, at the completion of which he was designated Army Aviator (4 weeks); Aircraft Maintenance Officer Repairs Technician Course (15 weeks); Military Accounting (4 weeks); Planning Program Budget; Logistics and Military Comptrollership (5 weeks). Plaintiff's duty performance during the period preceding December 1985 was deemed by his superiors to be "superb," "exemplary" and "outstanding."

In 1967, plaintiff had married at age seventeen. Three children were born during this marriage. In 1985, plaintiff's duty station was Schofield Barracks, Hawaii. Plaintiff and his wife experienced marital difficulties and divorced in March 1985 after 18 years of marriage. Plaintiff's wife then left Hawaii, taking the three children to reside in Florida. Plaintiff was 35 years of age at this time. According to plaintiff, the divorce and the loss of his children were emotionally and financially devastating to him. The divorce settlement, which required him to make alimony and support payments, reduced his net pay by more than one-half.

From December 31, 1985 to January 14, 1986 plaintiff "shoplifted" or wrongfully appropriated bottles of cologne and perfume from the Army and Air Force Exchange (AAFE) stores at Schofield Barracks, and thereafter returned them to AAFE stores at the Schofield Barracks, Pearl Harbor Naval Base and Hickam Air Force Base in Hawaii for refunds. Since plaintiff sought and obtained the refunds without a sales receipt, a check was made by concerned store personnel of the Refund Log in the Customer Service Area at the Schofield Main Exchange. An investigation established plaintiff's wrongful conduct sometime in January 1986, at which time plaintiff readily admitted his guilt and cooperated in the investigation of the matter. The investigation turned up six (6) AAFE Refund Vouchers in plaintiff's name representing bottles of cologne/perfume returned to AAFE stores by plaintiff for which payment in the amount of $563.00 was made to plaintiff. These refund vouchers were dated December 31, 1986, January 4, 1986, January 5, 1986, January 7, 1986, January 8, 1986 and January 10, 1986. In addition, three boxes containing perfume were recovered from plaintiff thereafter having a value of $126.00. Plaintiff alleges he sent the money to his children in Florida for living expenses and Christmas presents. Plaintiff made restitution to the AAFE in the amount of $624.00 on May 2, 1986.[1]

During the investigation in January 1986, plaintiff admitted his misconduct, knew that what he did was wrong and was cooperative and truthful with investigation officials. He appeared however to be emotionally depressed because he informed investigators he

---

1. The parties are in dispute over whether plaintiff "shoplifted" on at least six occasions or "shoplifted" on only one occasion. There is material in the record suggesting plaintiff "shoplifted" on more than one occasion. In plaintiff's application to the Army Board for the Correction of Military Records (ABCMR) in May 1990 he suggests he did it on more than one occasion. In his brief to the ABCMR on May 9, 1990 he states, in pertinent part after he purloined a bottle of cologne "... and [H]aving avoided detection, he repeated this conduct on approximately six other occasions...." The only place in the record which supports plaintiff's assertion that he only shoplifted on one occasion is his certified statement dated March 15, 1993 to the ABCMR. Plaintiff concedes that on this one occasion plaintiff shoplifted four bottles of perfume. The record supports the view he shoplifted on several occasions. The ABCMR found it unnecessary to resolve this specific matter.

was recently divorced and spent his first Christmas in 18 years without his family. Plaintiff was admitted to Tripler Army Hospital January 10, 1986. He presented as his reason for admission the recommendation of the Criminal Investigation Division (CID) investigator who was investigating criminal allegations against him. His hospital stay indicated he did not suffer from a psychotic illness, nor a medically boardable psychiatric illness, nor an unstable, impulse-ridden personality disorder. The hospital psychiatric report on plaintiff dated February 28, 1986 noted that plaintiff "seems to have been a stable, dependable adult who was presented with a very large psychological stress and responded in what he thought was a responsible fashion. In fact, he responded neurotically and with poor judgment." This report continued in pertinent part as follows:

The mental status examination revealed a young man who attempted to cooperate at all times. He exhibited a "smiling depression", ruefully admitting his poor judgment and culpability, but also attempting to project himself as basically trustworthy. There was no evidence of a thought disorder, delusions, or hallucinations. He was somewhat anxious, moderately depressed, with an appropriate affect, and without any symptoms of organicity.

Mr. Colon was a responsible patient on the ward, scrupulously following the rules. He showed no evidence of impulsivity and, conversely, a fine appreciation for good judgment. His insight for what happened was good, intellectually, after the fact. He also realized that he had gotten himself into a bad fix with the U.S. Army but wanted to salvage his career in the Army.

Plaintiff's diagnosis was "Adjustment Disorder of Adulthood." The report noted that plaintiff "had responded well to individual counseling and in group therapy. He appeared to be well motivated to continue his career as an Army Pilot." The report also noted in pertinent part that plaintiff's criminal misconduct "was not motivated by impulsiveness associated with a deeply ingrained pattern of behavior. It was neurotically precipitated." Plaintiff was discharged from the hospital and returned to duty on January 28, 1986.[2]

Plaintiff underwent a psychiatric examination by a civilian psychiatrist in July 1987 to determine if he had any psychiatric symptoms which would preclude him from going back to flying status. In the psychiatric report on this examination, it was noted that plaintiff was admitted to Tripler Army Medical Center in January 1986 "because of anxiety depression related to marital problems." It was also noted that at that time in 1986, plaintiff was also "facing a possible court martial because of possible charges of larceny PX" The July 1987 examination found plaintiff to be a well adjusted person who "seems to be free of any gross personality distortions, severe neurosis, and certainly free of any psychotic symptomatology."

On February 3, 1986, while assigned to Schofield Barracks, Hawaii, charges and specifications were preferred against plaintiff. The first specification charged plaintiff with wrongful appropriation [shoplifting] of bottles of cologne and perfume of a total value of about $769.00 from the AAFE stores during the period December 25, 1985 to January 14, 1986. The second specification charged plaintiff with larceny [voucher refunds for return of shoplifted bottles] of U.S. currency of a value of $643.00 from the AAFE stores during the period December 31, 1985 to January 14, 1986. These charges were deemed to be court-martial offenses and accordingly a trial by general court-martial was recommended. A hearing was scheduled for February 19 and 20, 1986 to investigate these charges and specifications.[3]

---

2. There is no evidence in the record, other than plaintiff's March 15, 1993 certified statement to the ABCMR, that he was "placed" on 24 hours suicide watch, sedated and then questioned about bottles of perfume he had exchanged.

3. Article 32 of the Uniform Code of Military Justice (UCMJ) requires a thorough and impartial investigation of all matters set forth in the charges and specifications before a charge and speculation may be referred to a general court-martial. At this investigation, commonly called an "Article 32 investigation," the accused is represented by counsel and has full opportunity to cross-examine witnesses, to confront the evidence to be proffered, and is entitled to the assistance of the investigating officer in arranging for the appearance of witnesses the accused

A military defense counsel, an Army captain, was assigned to represent plaintiff in this matter and he requested a delay in the Article 32 hearing until February 27, 1986. Plaintiff, through his counsel, subsequently waived (in writing) the pretrial investigation of the charges against him. Accordingly, the charges and specifications proffered against plaintiff were referred to a trial by general court-martial. The matter was tentatively set for trial to commence on April 28, 1986.

On March 6, 1986 plaintiff submitted a letter entitled "Resignation for the Good of the Service" through the Commanding General, Schofield Barracks, Hawaii to Army Headquarters in Alexandria, Virginia. This letter read in pertinent part as follows:

1. I, Julio L. Colon, Chief Warrant Officer Two, (SSN 069–40–2126), hereby tender my resignation from the Army for the good of the service under the provisions of chapter 5, AR 635–120. I do not desire to appear before a court-martial or board of officers. I have not been subject to coercion with respect to this resignation and have been advised of and fully understand the implications of this action.

2. I have been advised that prior to submitting this resignation I may, at my option, consult with and be represented by legally qualified counsel who may be a member of the Judge Advocate General's Corps or civilian counsel retained by me. I have been fully advised and counseled in this matter by CPT Joseph J. Lodge (a member of the Judge Advocate General's Corps) on 5 March 1986 at Schofield Barracks, Hawaii.

3. I have been afforded an opportunity to present matters in explanation, mitigation, or defense of my case and such matters are attached hereto.

4. I understand that this resignation, if accepted, may be considered as being under other than honorable conditions and that discharge certificate (Under Other Than Honorable Conditions (DD Form 79VA)) may be furnished. I also understand that a resignation for the good of the service may be withdrawn only with the approval of Headquarters, Department of the Army.

5. I further understand that if my resignation is accepted under other than honorable conditions, I will not be entitled to compensation for unused accrued leave. If my resignation is accepted, regardless of the type of discharge certificate furnished, I understand that I will not receive separation pay and that I shall be barred from all rights based upon the period of service from which I will be separated, under any laws administered by the Veteran's Administration, except War Risk, United States Government (converted), National Service Life Insurance, or Servicemen's Group Life Insurance policies I may hold.[4]

Plaintiff's request for discharge, by resignation, for the Good of the Service was thereafter processed through the Army's chain of command. Plaintiff's unit commander, a Captain, recommended approval of plaintiff's Resignation for the Good of the Service with issuance of an Honorable Discharge. The Battalion Commander, a Lt. Colonel, next recommended approval with issuance of a

---

may wish to have testify at the hearing. *See* 10 U.S.C. § 832.

4. A commissioned officer may seek to avoid a trial by court-martial by submitting a Resignation for the Good of the Service. Army Regulation (AR) 635–120, ¶ 5–1, 5–7. The tender of such a resignation does not automatically preclude court-martial. Further, Army Commanders are required by Army regulations to "ensure that there is no element of coercion." Plaintiff was required to undergo a Mental Status Evaluation on or about April 28, 1986. This evaluation found plaintiff's behavior at that time normal. He was found to be full alert, fully oriented and his mood anxious. His thinking process was found to be clear and his thought content nor-

mal. It was the opinion of the Army Psychologist that plaintiff had the mental capacity to understand and participate in Army proceedings, was mentally responsible, and met the retention requirements of AR 40–501, Ch. 3. Too, the officer concerned must be afforded an opportunity to confer with counsel on the matter of such a resignation and allowed a reasonable period of time to make such a decision. Legal counsel are required to fully advise the officer concerned of the implications of such a resignation. The regulations also provide that "[A] resignation for the good of the service, when approved by HQDA [Headquarters, Department of the Army], is normally accepted as being under other than honorable conditions." AR 635–120 ¶ 5–6a.

General Discharge. The Brigade Commander, a colonel, recommended issuance of a General Discharge. Thereafter on April 18, 1986 the Division Commander, a Major General, 25th Infantry Division, the general court-martial convening authority, recommended approval with issuance of a General Discharge, and forwarded the psychiatric assessment of plaintiff together with all recommendations to and documents relating to the court-martial to Army Headquarters in Alexandria, Virginia. The Division Commander advised Headquarters that he did not intend, however, to proceed to trial on the court-martial unless the request for approval of the resignation was disapproved.

By wire message dated May 18, 1986, Army Headquarters in Alexandria, Virginia advised plaintiff's command in Hawaii that plaintiff's Resignation for the Good of the Service was approved and that plaintiff was to be issued a discharge Under Other Than Honorable Conditions. As a result, plaintiff, on May 29, 1986, was discharged from the Army "under other than honorable conditions."

Plaintiff maintains that his March 6, 1986 Resignation for the Good of the Service was based on his understanding

> that the worst that would happen if I resigned was a General Discharge because that's what everyone recommended.[5] Had I known that an Other Than Honorable was possible, I would not have resigned. I was led to believe that the Department of the Army would go along with the recommendation of the Division Commander, which was the convening authority for a court-martial. He recommended a General Discharge. I know that the form that I signed on 6 March 1986 stated that "an Other Than Honorable may be furnished." But, I was told that the above statement was part of a standard letter and had to be included . . . .

The only support for the last sentence quoted above is plaintiff's assertion in his last

---

5. Plaintiff's understanding in this regard is based on advice that a friend and former commander, Major Barry P. Gerischer (Gerischer), gave him when he spoke with plaintiff in February 1986. Gerischer signed a notarized statement on the matter which is in the record and reads in pertinent part as follows:

> When I was first alerted of Julio's trouble in Hawaii, I was in command of the 25th Infantry Division (fwd) in Yongsan, South Korea. B.G. [Brigadier General] Arvid West, Assistant Division Commander, visited with me regarding the PX incident. I had been Julio's commander previously, recommended him for his position in the S-4, and directly supervised him as the Executive Officer, 25th Combat Aviation Battalion.
>
> I discussed Julio's options with B.G. West. B.G. West told me we would discuss the incident with the C.G., M.G. [Major General] Kicklighter, when he arrived in South Korea. In late January and early February, 1986, I met twice with B.G. West, [Assistant Division Commander] M.G. Kicklighter [Commander, 25th Infantry Division the general court-martial convening authority], and the J.A.G. It was apparent that we all three agreed that it would be best if Julio resigned. M.G. Kicklighter asked the J.A.G. officer to explain the various options, resign vs. court martial. I specifically asked M.G. Kicklighter what kind of discharge Julio would get. M.G. Kicklighter said the worst would be a General (under Honorable Conditions). I asked M.G. Kicklighter how he could conclude that if D.A. [Department of the Army] had to approve. He stated that, "he

> was the General Court Martial authority", and the entire chain of command was behind Julio. M.G. Kicklighter stated that D.A. could non-concur with us, but rarely did they go against the General Court Martial convening authority.
>
> Armed with this information, I contacted Capt. James McGowan, Julio's commander. I asked him how Julio was doing. He told me O.K. I told him of my discussion and told him to tell Julio. Also, I would see Julio on my return from Korea later that month (February, 1986).
>
> When I returned from Korea, I spoke with Julio. I told him what had been said. I do not recall if Julio told me or not if he was going to resign, however, I told him it was in his best interest to resign. It saves the Aviation community, the Division, and the Officer Corps.
>
> On approximately April 15, 1986, I again met with M.G. Kicklighter. I told the C.G. that in my opinion after what Julio had been through, he would resign and avoid all the other hassles. M.G. Kicklighter called the J.A.G. into the meeting and brought in B.G. West. M.G. Kicklighter stated he would accept Mr. Colon's resignation and recommend a General Discharge under honorable conditions. His basis was Julio's service record, personal situation, and exemplary service to the Division. I left the meeting and notified Capt. McGowan and Julio. This is the total of my knowledge on this situation, except I know M.G. Kicklighter had discussions with Col. Adams and L.T.C. Metzger on this issue, however, both had been in the unit for a short period of time.

letter to the ABCMR. Plaintiff does not identify who told him this. Accordingly, little or no weight should be given this statement by plaintiff. *See Boraiko v. United States*, 146 Ct.Cl. 814, 817, 1959 WL 7603 (1959). Further, other statements in plaintiff's briefs to the ABCMR raise serious questions about the truth of this sentence. In one of his briefs to the ABCMR, plaintiff asserts in pertinent part:

*   *   *   *   *   *

Applicant was understandably confused, nervous and depressed and sought advice from his detailed military defense counsel who indicated that he believed the command would be amendable to his resignation in lieu of trial by court-martial. (Supplement Administrative Record (SAR) p. 24)

*   *   *   *   *   *

Applicant was advised by his detailed military defense counsel that he could avoid a Court Martial by submitting a request for resignation for the good of the service under the provisions of Chapter 5, AR 635–120. Applicant was informed that since he had an outstanding prior service record and several of his superior officers would be strongly recommending that he be separated with an Honorable Discharge, he would, in all likelihood, be separated Honorably from the Army. In reliance on these representations, applicant tendered his resignation on March 6, 1986. (SAR p. 26)

Plaintiff applied to the ADRB on April 11, 1989 to have his discharge upgraded from Other Than Honorable to Honorable. The ADRB, after careful consideration of the record and plaintiff's arguments, concluded, "[T]he Board found no evidence in the record, nor was any presented by the applicant that indicated that the applicant's request to resign for the good of the service was other than voluntary on his part."

In his application to the ABCMR, plaintiff, *inter alia*, contended that he received "misinformation" about the consequences of submitting his resignation. He advised the ABCMR that "his decision to resign was made with the understanding that nothing worse than a General (Under Honorable Conditions) Discharge would result. This understanding was the direct result of advice received from his appointed military counsel. It was corroborated by the fact that every member of Mr. Colon's chain of command, including Brigadier General Arvid E. West, recommended no less than a General Discharge—some even recommended an Honorable one.... Unfortunately, officials at the Department of the Army level felt differently—they overrode the recommendations of the officers who best knew Mr. Colon and the surrounding circumstances by directing a discharge under other than Honorable Conditions." Plaintiff argued to the ABCMR that "[F]or whatever reason, the advice Mr. Colon received and upon which he directly relied when deciding to tender his resignation proved to be incorrect. His decision was rendered unintelligent, as a matter of law." Subsequently, plaintiff provided the ABCMR with a notarized statement from a retired major, Barry P. Gerischer, who was plaintiff's commander prior to the events of late December 1986 and early January 1987. This statement was proffered in support of plaintiff's claim that he submitted his resignation with the understanding that he would receive no less than a General Discharge.

Plaintiff appeared before the Board with counsel. The ABCMR acknowledged the support plaintiff received from his superiors as follows:

The applicant's commander recommended approval of his resignation with issuance of an honorable discharge. His battalion commander recommended approval with the general discharge. On 15 April 1986 the brigade commander recommended approval of the request for discharge for the good of the service with issuance of a general discharge. In support of that recommendation he stated that while charges pending against the applicant were serious ones, the incidents out of which they arose were largely attributable to the mental stress generated by a difficult divorce and the severe financial crises flowing therefrom. His performance and support of his unit theretofore had been exemplary. The entire brigade community supported him.

By virtue of having committed the charged offenses, he no longer deserved to remain in the the [sic] service; however, he did deserve the brigade's assistance in entering civilian life without further disabilities generated by this incident.

The ABCMR made the following determination relative to the voluntariness of plaintiff's March 6, 1986 resignation:

\*   \*   \*   \*   \*   \*

6. The applicant tendered his resignation, acknowledging, in writing, his understanding that he could receive a discharge under other than honorable conditions. While the evidence supports his contention that his entire chain recommended that he receive at least a general discharge, he should have known that their recommendations were no guarantee that he would not receive a discharge under other than honorable conditions. The final authority for the approval of his discharge was Headquarters, Department of the Army. His chain of command's recommendations were just recommendations.

7. The applicant has not shown that he did not understand the range of options available to him or their consequences. As a matter of fact, the very fact that he now indicates he would not have tendered his resignation had he known he could receive less than a general discharge indicates he was well aware of what was going on and was looking out for his best interest when he tendered his resignation to avoid trial by court-martial.

8. The applicant's discharge was accomplished in substantial compliance with applicable regulations with no indication of procedural errors which would tend to jeopardize his rights. The characterization of his service [sic] as being under other than honorable conditions was appropriate.

\*   \*   \*   \*   \*   \*

*DETERMINATION:* The applicant has failed to submit sufficient relevant evidence to demonstrate the existence of probable material error or injustice.

The record supports the ABCMR's determinations set forth above.[6]

Plaintiff faults the ABCMR for not accepting at face value plaintiff's statement that if he knew he was at risk of receiving a discharge Under Other Than Honorable Conditions he would not have tendered his resignation but would have faced the court-martial charges. There is substantial evidence, reasonably read and considered, in the record to support the Board's finding that the recommendations of his superiors that he receive a General Discharge were recommendations only and did not guarantee that he would not receive a discharge Under Other Than Honorable Conditions and that plaintiff knew or should have known of the risk he faced in submitting his resignation for the good of the service.

### DISCUSSION

The dispositive issue before the court is the voluntariness of plaintiff's March 6, 1986 resignation from the Army for the good of the service. Defendant contends that plaintiff's resignation was voluntary and that, accordingly, the court has no jurisdiction over his claims for back pay and allowances and reinstatement. Case law supports this proposition. *Sammt v. United States,* 780 F.2d 31, 32–33 (Fed.Cir.1985); *McIntyre v. United States,* 30 Fed.Cl. 207, 211–12 (1993); *Heaphy v. United States,* 23 Cl.Ct. 697 (1991), *aff'd,* 972 F.2d 1355 (Fed.Cir.1992); *Sullivan v. United States,* 4 Cl.Ct. 70, 75 (1983), *aff'd,* 742 F.2d 628 (Fed.Cir.1984); *see also Clifton*

---

6. In attacking the ABCMR determination, plaintiff argues that the Board denied relief because it focused on what plaintiff "should have known" and not on what he actually knew. Plaintiff dismisses that portion of his March 6, 1986 resignation letter dealing with the possibility that he might receive an Other Than Honorable Discharge, a letter he signed, because it was "boiler plate," a part of the standardized resignation letter offered as an example in the Army Regulations. Plaintiff does not deny he read that portion of the resignation letter. He was aware of that risk when he signed the letter. Instead, plaintiff suggests that the language pointing out the risk was just verbiage in a "boiler plate" letter and could be ignored. It was this language that the Board referred to when it found that plaintiff "should have known" that the recommendations of his superiors did not mean that plaintiff was guaranteed a General Discharge.

v. *United States*, 31 Fed.Cl. 593 (1994). Plaintiff, however, contends his resignation was involuntary because he was misled about the consequences that would ensue from the submission of his resignation. *Fairchild v. Lehman*, 814 F.2d 1555, 1559–60 (Fed.Cir. 1987), *aff'g* 609 F.Supp. 287 (E.D.Va.1985) lends support to this contention.[7] Thus, the critical factual issue is whether plaintiff was misled about the possible consequences of his submission of a resignation for the good of the service under the existing circumstances of a scheduled court-martial proceeding.

### A. The March 6, 1986 Resignation

■ Whether a resignation is voluntary or not requires an examination of all the facts and circumstances. *Covington v. Department of Health & Human Services*, 750 F.2d 937, 941–42 (Fed.Cir.1984). The purpose of such a factual inquiry is to ascertain whether the plaintiff exercised free choice in submitting his resignation. *McIntyre*, 30 Fed.Cl. at 211. Resignations are presumed to be voluntary. *Bergman v. United States*, 28 Fed.Cl. 580, 585 (1993). This presumption of voluntariness can be rebutted by showing that the government intentionally misrepresented information relied on by plaintiff in tendering his resignation. *McIntyre*, 30 Fed.Cl. at 211; *see also Scharf v. Department of Air Force*, 710 F.2d 1572 (Fed.Cir. 1983). However, this presumption of volun-

tariness is not rebutted if the plaintiff had to choose between two unattractive alternatives and now regrets the choice he actually made. *Id.* at 211.

Plaintiff does not rely on duress or coercive acts of military personnel in support of his contention that his resignation was involuntary. Nor does plaintiff contend that military personnel intentionally misrepresented the information he relied on when he signed and submitted his resignation. Further, he does not argue that he was not competent to appreciate the consequences of his decision to submit his resignation. Plaintiff's position, simply stated, is that he was misadvised about the consequences that would flow from his resignation.

Plaintiff "believed" and "understood" that if he submitted a resignation, for the good of the service, "he would receive no less than a General Discharge Under Honorable Conditions." Plaintiff was willing to accept this type of a discharge.[8]

Plaintiff's "belief" and "understanding" in this regard emanate from the following facts.

■ Plaintiff was charged with misconduct that was subject to court-martial. The misconduct was admitted and evidence was available in support thereof. While the court-martial trial was scheduled to commence in April 1986, the Article 32(b) investigation had been waived at plaintiff's re-

---

7. "Defendant has filed a motion to dismiss the complaint under RCFC 12(b)(1), or in the alternative, for summary judgment under RCFC 56.1. Generally, a motion for summary judgment based on a lack of jurisdiction is treated as a motion to dismiss under RCFC 12(b)(1). In this case, defendant's summary judgment motion and plaintiff's cross-motion for summary judgment are directed at the propriety of the ABCMR's determination that plaintiff's resignation and subsequent discharge were proper and appropriate. Plaintiff opposes defendant's RCFC 12(b)(1) motion on the ground his resignation was involuntary. Both parties rely, in support of their positions, on the administrative record which was before the ABCMR. For purposes of passing on a motion to dismiss pursuant to RCFC 12(b)(1), the court can consider materials outside the pleadings. *See Clifton v. United States*, 31 Fed.Cl. 593, 596 (1994). Thus, the resignation issue is central to both the motion to dismiss and the motions for summary judgment. Resolution of the resignation issue will dispose of these motions.

8. In his claim to the ADRB, plaintiff sought to have his discharge upgraded from "other than Honorable" to "Honorable." He did not challenge the discharge itself but merely sought to have it recharacterized. Before the ABCMR, plaintiff again sought to have his discharge upgraded from "other than Honorable" to "Honorable" and also asked the ABCMR to "take such other and further action as equity may require." In his application to the ABCMR plaintiff advised in pertinent part, ".... I understood from my superiors that they would be recommending the issuance of an honorable discharge. However, it turned out that I was discharged under other than honorable conditions." In truth, his superiors recommended, which he now concedes was correct, that he be given a General Discharge under Honorable Conditions. Plaintiff now seeks back pay, allowances and reinstatement to his Army position.

quest—concurred in by the government, plaintiff's supervisors were willing to recommend to the Department of the Army, the decision making authority in such situations, that he be given no less than a General Discharge under Honorable Conditions if he were to resign for the good of the service in lieu of trial by court-martial. This information was passed on to plaintiff and his military attorney. His supervisors, as they had said they would, did in fact recommend to the Department of the Army that he be given a General Discharge under Honorable Conditions in lieu of trial by court-martial. There was no misinformation involved. His superiors did exactly what they said they would do. *See Bergman,* 28 Fed.Cl. at 588–89. Plaintiff reads into the word "recommend," a "guarantee" that he would be given a General Discharge.

Plaintiff claims that he "was led to believe that the Department of the Army would go along with the recommendation of the Division Commander who was the convening authority for a court-martial. He recommended a General Discharge. I know that the form that I signed on 6 March 1986 stated that an other than Honorable may be furnished. But I was told that the above statement was part of a standard letter and had to be included...."[9] Thus, plaintiff was aware that the resignation statement he signed informed him in no uncertain terms that his resignation, if accepted "may be considered as being under other than honorable conditions and that the discharge certificate (Under Other Than Honorable Conditions (DD Form 794A)) may be furnished...." The record indicates that plaintiff was a capable, competent and intelligent person. Plaintiff's Officer Evaluation Report

for the period June 7, 1985 through May 26, 1986, states that "[h]is expertise in the budget field is without equal," and that he had "[e]xcellent potential for positions of greater responsibility in the programming and budget area." Plaintiff was aware of the risk he faced when he submitted his resignation on March 6, 1986. By his signature on his resignation letter, plaintiff certified that he understood the elements of the offenses charged and that he understood that he possibly could be discharged Under Other Than Honorable Conditions. This fact clearly supports the voluntariness of plaintiff's discharge. *Clifton,* 31 Fed.Cl. at 595, 598.

Plaintiff seeks to denigrate the March 6, 1986 resignation letter by stressing that the format for the resignation letter was set out in the Army Regulations covering Resignations for the Good of the Service, AR 635–120 (1989). But the fact that a simple resignation letter is available to serve as a guide does not serve to excuse one who willingly and knowingly signs it. His signature on the March 6, 1986 resignation meant he had read and accepted the risk spelled out therein. Plaintiff argues that while he read and understood this, his resignation letter advised him that he "may" be considered for discharge Under Other Than Honorable Conditions, his superiors and his military attorneys "assured him of what would occur—since the chain of command would be supporting him, a general discharge was the worst possible risk he faced."[10] But the fact of the matter is the risk of a discharge, worse than a General Discharge was present and was known or should have been known to plaintiff. This risk was brought to plaintiff's attention directly in the March 6, 1986 resignation letter he signed. In circumstances in-

---

**9.** Plaintiff does not identify who told him this about the statement and thus the inference plaintiff seeks to draw therefrom, *i.e.,* that he should ignore the statement cannot be drawn in any event. *See Boraiko v. United States,* 146 Ct.Cl. 814, 817, 1959 WL 7603 (1959).

**10.** The only support for this is plaintiff's statements to the ADRB and the ABCMR. There are in the record inconsistencies in plaintiff's various presentations that require caution in accepting at full value unsupported self-serving statements. The statement of Major Gerischer, set forth in full in the Facts statement above, indicates that

what most probably occurred was that plaintiff's superiors advised plaintiff that since they, which included the General Court Martial Authority and the chain of command were supportive of him, they expected their recommendations, a General Discharge Under Honorable Conditions, would be the worst that he would receive, but that the Department of the Army "could nonconcur with us [reject the recommendation], but rarely did they go against the General Court Martial convening authority." Major Gerischer passed all this information on to plaintiff before plaintiff signed his resignation letter.

volving misrepresentation, the courts utilize an objective test. The court will not inquire into the subjective perceptions of the employee nor the subjective intention of the agency. *Scharf v. Department of Air Force,* 710 F.2d 1572, 1575 (Fed.Cir.1983); *Covington v. Department of Health & Human Services,* 750 F.2d 937, 947 (Fed.Cir.1984). The objective test here is whether, under the circumstances, a reasonable person would have been misled by the statements of Army officials. In this case there was no misrepresentation. Plaintiff was advised what they intended to do, *i.e.,* recommend that he be given a General Discharge. A reasonable person would know that a recommendation is only that; it is not a guarantee. Further, his resignation letter which he read and understood, clearly stated that the recommendation of a General Discharge might not be accepted and that he could receive an Other Than Honorable Conditions Discharge.

One must not lose sight of the fact that plaintiff was facing a court-martial trial. He was accused of stealing from the military exchange, which he admitted and then returning the stolen merchandise for cash refunds, which he admitted, and which refunds were recorded in vouchers signed by plaintiff. He had admitted to misconduct and the evidence against him was not trivial. Too, his superiors, while supportive of him, felt he should resign for the good of the service. Contrary to plaintiff's speculation before the ADRB that he would not have faced punitive damages had he gone the court-martial route, the risk was present. Moreover, whether the charges could have been sustained or not or whether he would have faced punitive damages or not is irrelevant. "What is relevant is that the admission of this incident is *prima facie* evidence that an arguable basis for discharge existed." *Christie v.*

*United States,* 207 Ct.Cl. 333, 339, 518 F.2d 584, 588 (1975). In signing his resignation letter on March 6, 1986, he greatly lessened the risk of a court-martial and a punitive discharge, possible loss of pay, etc., but accepted the risk that he might not get a General Discharge.

The risks between the two unattractive alternatives available to plaintiff were not hidden. They were open and clear. Plaintiff now regrets the alternative he chose and seeks to have the court obliterate that choice by claiming now that if he had known that his resignation would be accepted with the discharge characterized as Under Other Than Honorable Conditions he would not have signed the resignation. But the presumption of voluntary which attaches to a signed resignation is not rebutted merely because an unattractive, but possible, risk comes to pass. *McIntyre,* 30 Fed.Cl. at 211. Hindsight does not serve to convert a voluntary resignation into an involuntary resignation.

## B. Administrative Determinations

The issue of the voluntary nature of plaintiff's March 6, 1986 resignation was considered by both the ADRB and the ABCMR.

Before the ADRB, plaintiff contended that the voluntariness of plaintiff's resignation for the good of the service was suspect. In this regard, plaintiff attempted to paint a picture of himself as a "confused, emotionally upset individual who had recently been hospitalized for depression being told by his doctor, lawyer, Chaplain and Superior Commissioned Officers to take the Good of the Service Discharge and be virtually assured of a characterization of service no worse than General as opposed to the chance of receiving a punitive discharge at court-martial." [11] This manifests the choice of unpleasant alterna-

---

11. There were three psychiatric evaluations dated January 28, 1987, February 28, 1987 and July 2, 1987 of plaintiff covering the period before and after he signed his resignation on March 6, 1987. None of these examinations support the view that plaintiff was "confused" and "emotionally upset" on March 6, 1987 when he signed his resignation or that his resignation was in any manner the result of impaired thinking or any thought disorder. Plaintiff, according to these evaluations, had no medically boardable psychi-

atric illness. Plaintiff was discharged back to duty on January 28, 1986. In a Report of Mental Status Evaluation on April 28, 1986, it noted plaintiff had attended 6 sessions since January 28, 1986. Plaintiff was found during this period to be fully alert with clear thinking process and normal thought content, that plaintiff had the mental capacity to understand and participate in proceedings, and that plaintiff was mentally responsible.

tives that confronted plaintiff. There were risks associated with whatever alternative plaintiff selected. This fact was known and appreciated by plaintiff when he submitted his resignation. Before the ADRB, plaintiff did not clearly allege as he does now that his resignation was the result of being misinformed about the consequences of his resignation.

Contrary to his language in his March 6, 1986 resignation letter that "I understood that his resignation, if accepted, may be considered as being under other than honorable conditions and that discharge certificate (Under Other than Honorable Conditions (DD Form 79VA)) may be furnished," plaintiff now maintains that when he submitted this resignation for the Good of the Service he subjectively understood and believed the worst he could receive was a General Discharge. As indicated previously, plaintiff's subjective perceptions are lacking in weight. The test in cases such as this must be an objective one. *Scharf,* 710 F.2d at 1575; *Covington,* 750 F.2d at 947. There was, the record shows, reason for plaintiff to be optimistic in this regard for he had been told that his superiors, including the general court martial convening authority, would recommend, at the worst, a General Discharge, and objectively they did just that. But the record also supports the view that since his superiors could only offer recommendations, he was also told that there was a risk that these recommendations might not be accepted and that he could be discharged Under Other Than Honorable Conditions. This fact, as indicated above, was supported by plaintiff's letter of resignation and by Major Gerischer's statement discussed previously.

As indicated earlier, plaintiff's Resignation for the Good of the Service was approved by the Department of the Army and plaintiff was discharged on May 29, 1986, Under Other Than Honorable Conditions. On April 11, 1989, plaintiff petitioned the Army Discharge Review Board (ADRB) to change his discharge from Other Than Honorable Conditions to Honorable. This was the only relief plaintiff sought from the ADRB. Plaintiff did not contest the discharge itself. Plaintiff requested, and was given, a personal hearing

before the ADRB. Plaintiff appeared before the ADRB and was represented by civilian counsel of his own choosing. Plaintiff presented evidence to the ADRB including character references, and was confronted with and given the opportunity to respond to all the evidence and materials before the ADRB. No witnesses appeared before the ADRB. Briefs were submitted by plaintiff to the ADRB.

Before the ADRB, plaintiff did not contest the facts of his misconduct relative to wrongful appropriation, shoplifting, of cologne and perfume from the AAFE stores and larceny of currency from the AAFE stores. The contentions plaintiff presented to the ADRB were: 1) The Other Than Honorable Discharge was too harsh in light of plaintiff's overall service record; 2) a punitive discharge would likely not have resulted had there been a trial by court-martial; and 3) the voluntariness of the applicant's Resignation for the Good of the Service is suspect.

The ADRB reviewed the record before it and gave due consideration to plaintiff's presentations. As to the first issue, the ADRB acknowledged plaintiff's excellent duty service over a period of six years. It found that plaintiff's admitted misconduct constituted offenses subject to trial by court-martial for which a punitive discharge could have been rendered. The ADRB addressed the first issue in pertinent part as follows:

A close examination of the documentary evidence in the record, and sworn testimony by the applicant, revealed that the applicant was under a great deal of financial and mental stress at the time he committed the acts of shoplifting bottles of perfume from the PX in Hawaii. The applicant testified that it was a one time act committed on impulse to obtain funds for gifts for his children at Christmas time, however, this is not substantiated by the evidence of record. The applicant's brief submitted with his DD Form 293 acknowledges this occurred on a least six separate occasions. The applicant had recently been divorced by his wife and was experiencing his first Christmas without his family in 18 years and was emotionally depressed. The applicant testified that he

knew what he did was wrong and was fully cooperative and truthful with investigating officials at the time he was confronted by authorities. On the recommendation of CID investigators, the applicant was admitted for 2 weeks of inpatient treatment at Tripler Army Hospital where he was diagnosed as suffering from an "adjustment disorder of adulthood" and a finding that his act of misconduct was neurotically precipitated and not a manifestation of a character defect. While the Board did not find this evidence mitigating, it did find it explanatory as to why the company commander, battalion commander, brigade commander, assistant division commander and division commander may have recommended discharge under honorable conditions as opposed to under other than honorable conditions in this case. The majority of the Board was of the opinion that an under other than honorable conditions discharge was appropriate in this case. Accordingly, the Board found the reason for discharge and the characterization of service both proper and equitable and voted to deny relief.

As to the second issue, i.e., that a court-martial trial would, most likely not have resulted in a punitive discharge, the ADRB observed that this "issue is not a matter on which the Army Discharge Review Board grants a change in discharge because the issue raises no matters of fact, law, procedure or discretion relating to the discharge process." As indicated earlier this matter is irrelevant. *Christie,* 207 Ct.Cl. at 339, 518 F.2d at 588.

As to the third issue, the ADRB found that:

The record reflects the applicant's rights where fully protected throughout the process and that he had proper legal representation. The Board found no evidence in the record, nor was any presented by the applicant, that indicated that the applicant's request to resign for the good of the Service was other that [sic] voluntary on his part. Accordingly, the Board voted to deny relief.

The ADRB also referred to its response to the first issue, set forth above, in discussing the third issue.

In summary, the ADRB (five members) unanimously found the characterization of plaintiff's discharge, Under Other Than Honorable Conditions, to be proper and equitable.

On May 9, 1990, plaintiff filed an application for correction of his military records with the Army Board for Correction of Military Records (ABMCR). In this application, plaintiff sought to upgrade the Other Than Honorable Discharge he received on May 29, 1986 to an Honorable Discharge. Plaintiff in his brief in support of this application presented essentially the same issues and contentions advanced previously before the ADRB. On September 16, 1991, the ABCMR denied the application as not timely filed within the time limits prescribed by 10 U.S.C. § 1552(b). The ABCMR also assured plaintiff that it was only after it determined that no error or injustice existed relative to the characterization of his discharge that it considered the statute of limitations issue. "Had the Board found [the ABCMR advised] your case meritorious it would have excused the failure to timely file. The Board has never rejected an application simply because of a failure to apply within the time prescribed."

On May 21, 1992, plaintiff filed his first complaint in this court (then the United States Claims Court) contending his discharge on May 29, 1986 was "illegally effectuated and excessively characterized." Plaintiff sought back pay, allowances and other benefits illegally denied since May 1986; correction of his records to reflect continuous active duty service through the date of judgment; reinstatement to active duty service; and such other and further relief as is deemed necessary.

On July 21, 1992 defendant moved to dismiss plaintiff's complaint or in the alternative for summary judgment based on the contention that plaintiff's voluntary resignation deprived the court of jurisdiction to entertain his claim. Plaintiff thereafter moved to stay further proceedings in the case pending further action before the ABCMR. The court

granted plaintiff's motion, without objection, on August 4, 1992.

Thereafter, on March 17, 1993, plaintiff claiming "new information and new contentions" requested the ABCMR to reconsider his earlier application for correction of his military record. First, plaintiff contended his application was timely. As to this matter, the ABCMR first noted that while it initially denied the claim as being untimely it did consider the merits of the claim even though there was no written discussion of the issues involved. The ABCMR continued, in pertinent part, as follows:

Nonetheless, since the applicant promptly filed his appeal to the ABCMR upon completion of the ADRB's action and since he now has submitted new evidence not previously considered by the Board in the form of the notarized statement from a former commander, the Board now considers it appropriate to waive the statute of limitations and to discuss the merits of the case.

Part of the "new information" which plaintiff asserted as a basis for his reconsideration request was described by the ABCMR, in pertinent part, as follows:

The attorney concedes, turning to the merits of the case, that with one exception, the facts of the case are not in dispute. That exception involves the number of times the applicant shoplifted merchandise, which is alleged to have been only once. The attorney invites the Board's attention to the applicant's current statement [which differed from statements previously made by plaintiff or on his behalf] wherein he states that on one occasion he impulsively took four bottles of perfume from the PX. Two of those, plus four bottles his ex-wife had previously purchased but left behind after their divorce, were then returned for cash refunds.

The ABCMR answered this contention as follows:

His attorney views the crux of this case as being the number of times the applicant shoplifted merchandise from the military exchanges, contending this was only one-time lapse in judgment. Assuming, without conceding, that his count is correct, the Board considers even a one-time act of admitted shoplifting to be unacceptable behavior and a sufficient basis for preferring charges against an officer of the United States Army and referring those charges to a court-martial.

Neither his defense that he shoplifted to provide Christmas gifts for his children nor his mental state at the time justifies the applicant's deliberate and unlawful misconduct, first in stealing from the military exchange and then returning the stolen merchandise for cash refund.

As indicated by medical authorities, the applicant responded neurotically and with poor judgment in an admittedly stressful situation. Under the circumstances, as indicated by his brigade commander, having committed the charged offense, even if only once and for whatever reason, he did not deserve to remain in the service.

Another part of the "new information" which plaintiff asserted as a basis for his reconsideration request was described by the ABCMR as follows:

In support of this request, a notarized statement from a retired major who was the applicant's commander prior to the events at issue has been submitted.

The statement supports the applicant's claim that he submitted his resignation with the understanding that he would receive no less than a general discharge.

The ABCMR responded to this "new information" as follows:

The applicant tendered his resignation, acknowledging, in writing, his understanding that he could receive a discharge under other than honorable conditions. While the evidence supports his contention that his entire chain recommended that he receive at least a general discharge, he should have known that their recommendations were no guarantee that he would not receive a discharge under other than honorable conditions. The final authority for the approval of his discharge was Headquarters, Department of the Army. His chain of command's recommendations were just recommendations.

As to the voluntary nature of plaintiff's resignation, the ABCMR concluded as follows:

> Regarding the voluntariness of the applicant's resignation, the attorney argues that the psychiatric, medical and mental pressures the applicant was under at the time precluded a full understanding of the range of available options or of their consequences. Further, his decision to submit his resignation was made with the understanding that nothing worse than a general discharge would result. He contends this understanding was the direct result of advice received from his appointed military counsel and was corroborated by the fact that every member of his chain of command recommended no less than a general discharge.

> The applicant has not shown that he did not understand the range of options available to him or their consequences. As a matter of fact, the very fact that he now indicates he would not have tendered his resignation had he known he could receive less than a general discharge indicates he was well aware of what was going on and was looking out for his best interest when he tendered his resignation to avoid trial by court-martial.[12]

Upon consideration of the record before it, which record is now before the court, the ABCMR concluded in pertinent part:

> The applicant's discharge was accomplished in substantial compliance with applicable regulations with no indication of procedural errors which would tend to jeopardize his rights. The characteriza-

tion of his sevice [sic] as being under other than honorable conditions was appropriate.

\*    \*    \*    \*    \*    \*

> *DETERMINATION:* The applicant has failed to submit sufficient relevant evidence to demonstrate the existence of probable material error or injustice.

The ABCMR's Determination was issued on January 28, 1994.

On May 9, 1994, plaintiff filed his First Amended Complaint with the court. In this amended complaint, plaintiff contends that his discharge from the Army was illegal because his resignation was involuntary and that the failure of the ABCMR to remedy that error was arbitrary, capricious, contrary to law and unsupported by the evidence. Plaintiff's prayer for relief remained the same as set forth in his original petition.

Plaintiff challenges the ABCMR's (the Board) determination that his resignation was voluntary. Plaintiff contends he was misinformed in that he was led to believe that if he resigned for the good of the service he would receive a General Discharge. If plaintiff was misinformed, *i.e.,* the advice he received was erroneous as to the consequences of his submitting his resignation, then a finding that his resignation was involuntary would be appropriate. *Fairchild,* 814 F.2d at 1559–60.[13]

The record clearly indicates that plaintiff was not misinformed about the sequences of submitting his resignation. Further, plaintiff was not given any erroneous advice. Plaintiff was advised by his superiors that they

---

12. While the record is replete with evidence of plaintiff's misconduct, plaintiff argues that "he made an incriminating statement while hospitalized on 'suicide watch' in the psychiatric ward, while still undergoing psychiatric treatment and therapy and without accurate information about the consequences of his action." Support for this subjective assertion can only be found in plaintiff's request for further consideration that he submitted to the ABCMR in March 1993. There is no objective evidence in the record supportive of these assertions.

13. Plaintiff relies heavily on the *Fairchild* case, but this reliance is misplaced because the facts in *Fairchild* were different. In *Fairchild,* a discharged serviceman was misinformed in that he was erroneously told that if he elected nonjudi-

cial punishment he would not received an adverse discharge. Fairchild elected nonjudicial punishment. Later, Fairchild was discharged Under Other Than Honorable Conditions based upon the nonjudicial punishment for use of marijuana. The advice Fairchild received from his military counsel was erroneous because he could receive an adverse discharge based on the nonjudicial punishment for use of marijuana. On the basis of this advice, plaintiff waived his statutory right to trial by court-martial. The Federal Circuit found that Fairchild's waiver of his statutory right to trial by court-martial was not an intelligent waiver when he was misinformed of the consequences of electing nonjudicial punishment by counsel provided by the military.

would recommend that he be given a General Discharge. This came to pass. Plaintiff was also told by his former superior, Major Gerischer, that the "entire chain of command was behind" him, that his superiors felt the worst he would receive would be a General Discharge (under honorable conditions) but that the "D.A. [Department of Army] could nonconcur with us, but rarely did they go against the General Court Martial convening authority."[14] The risk that he might not get a General Discharge was made known to plaintiff by Major Gerischer. Plaintiff was not given any erroneous advice nor was he misinformed. His superiors were, at best, overly optimistic about his chances for a General Discharge but they were not clairvoyant and so informed plaintiff by pointing out "the D.A. could nonconcur with us."

More importantly, plaintiff read and signed his March 6, 1986 resignation letter wherein he acknowledged "that this resignation, if accepted, may be considered as being under other than honorable conditions and that discharge certificate (Under Other Than Honorable Conditions (DD Form 79VA)) may be furnished." The words in the resignation letter were a clear recognition of the risk he took when he submitted his resignation. The fact that the letter was "boiler plate" does not detract from the import of the words. Plaintiff acknowledges the import of the words but "explained his understanding of that language as a routine statement of the standard range of options generally available

to the Department of the Army in the context of a Resignation for the Good of the Service under AR 635–120 ..." Plaintiff's Reply Brief at 3. Plaintiff contends now that he was unconcerned about this language in the resignation because he had been told that since his "chain of command would be supporting, a general discharge was the worst possible risk he faced." *Id.* at 4.

Plaintiff contends he would not have tendered a resignation had he known that he could possibly receive an Other Than Honorable Discharge. There is nothing in the record that objectively supports this contention. It is purely speculative, hindsight, and self-serving. The resignation letter he signed, freely and voluntarily spelled out the risk that he could possibly receive an Other Than Honorable Discharge. The risk was there and it was known to plaintiff. He cannot ignore the fact the risk was made known to him no matter how he attempts to rationalize his action of submitting the resignation letter.

At the time he tendered his resignation on March 6, 1986, plaintiff's court-martial trial was scheduled to commence on April 28, 1986. The charges against him, shoplifting and larceny, were documented and admitted. Indeed, plaintiff had reimbursed the AAFE stores $624.00 relative to his misconduct. Thus, plaintiff was faced with two unpleasant alternatives, a court-martial trial or resignation.[15] He chose resignation. There were risks relative to each alternative. Plaintiff

---

**14.** Plaintiff contends that a fair reading of Major Gerischer's statement suggests that while the recommendations of plaintiff's superiors could be rejected ("nonconcur with us"), plaintiff's superiors "offered assurance to the contrary and discounting it as even a reasonable probability." The statement of course speaks for itself. The statement of Major Gerischer clearly shows that the recommendations of the superiors were, in the words of the Board, "just recommendations." The Department of the Army made the final decisions and that decision could differ from the recommendations proffered. The risk that these recommendations would not be approved by the Department of the Army, no matter how minimal or improbable, was there, and plaintiff was told of that risk as indicated by Major Gerischer in his statement "I told him (plaintiff) what had been said." *See* n. 5, *supra.* Unlike the situation in *Fairchild*, relied on by plaintiff, plaintiff was not told *in haec verba* that if he submitted his resignation he would receive no worse than a

General Discharge. Instead he was told the chain of commend would "recommend" a General Discharge but the Department of the Army had the final say on the matter and an Other Than Honorable Discharge could be issued to him if his resignation was accepted. No erroneous advice was given plaintiff and no misinformation was provided to him. The *Fairchild* holding is inapposite to this case.

**15.** At the administrative level, plaintiff speculated that a court-martial would not have resulted in a punitive discharge. One could easily speculate otherwise. While plaintiff's supervisors were willing to support plaintiff by recommending a General Discharge, the record is clear that they felt he should leave the service. Should a court-martial trial have taken place, a punitive discharge, and more, one could speculate, may have been the outcome.

chose the resignation route. His choice was a voluntary one. He was not misinformed nor was he given erroneous advice. Plaintiff has failed to overcome the presumption that his resignation was voluntary. *Christie,* 207 Ct.Cl. at 338, 518 F.2d at 588; *Bergman,* 28 Fed.Cl. at 586, 588–89.

The ABCMR found plaintiff's resignation to be voluntary. The record contains substantial evidence to support this determination. Plaintiff has failed to establish by "cogent and clearly convincing evidence" that the determination by the ABCMR denying plaintiff relief was "arbitrary, capricious, contrary to law or unsupported by substantial evidence." *See Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986).

 In the administration of personnel matters, the courts are deferential to the findings of military boards, recognizing that military officials, like other public officials, are presumed to discharge their duties correctly, lawfully and in good faith. *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979). Further, a court should not substitute its view for the view and judgment of the military in personnel matters. *Woodward v. United States,* 871 F.2d 1068, 1077 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990). One must remember that the military is a specialized community governed by discipline separate from civilian discipline. Courts are not equipped "to determine the impact upon discipline that any particular intrusion upon military authority might have." *Chappell v. Wallace,* 462 U.S. 296, 305, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983). The above observations are particularly applicable to the case at bar. In the instant case, there are no violations of statutes or regulations. This is basically a case of military discipline. Plaintiff, in essence, feels that the penalty assessed against him for certain misconduct was too severe. However, the discipline imposed was one the military was equipped to determine, not the court. In the area of discipline, courts should allow the widest possible latitude to the military in their administration of personnel matters. *Crager v.*

*United States,* 25 Cl.Ct. 400, 406–07 (1992). The factual issue of whether his resignation was voluntary was likewise within the province of the ABCMR.

### CONCLUSION

Based on the discussion above the court concludes that defendant's motion to dismiss and/or defendant's motion for summary judgment must be granted. Plaintiff's cross-motion for summary judgment is denied. The clerk is directed to dismiss the complaint, as amended. No costs.